IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JUSTIN HANNERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 3:13-cv-735-WHA |
| | ) | |
| CITY OF AUBURN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

This matter is before the court on a Motion for Summary Judgment (Doc. # 25) filed by Defendants City of Auburn, Alabama ("Auburn"), Thomas Dawson ("Dawson"), and Charles Duggan ("Duggan") on June 6, 2014.

Plaintiff Justin Hanners ("Hanners") filed his Complaint (Doc. # 1-1) in the Circuit Court of Montgomery County, Alabama on August 30, 2013. In the Complaint, the Plaintiff brings a First Amendment Retaliation Claim under Section 1983 (Count One) and a claim for a violation of the State Employees Protection Act (Count Two). The Defendants removed the Complaint to this court on October 4, 2013. The Defendants seek summary judgment on both counts of the Complaint.

The court has federal-question subject-matter jurisdiction over the Section 1983 claims, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claim, *see* 28 U.S.C. § 1367.

Basically, Hanners contends that various actions taken against him, finally including termination from the Auburn Police Department, were substantially motivated by his having spoken out against what he perceived to be a quota system for traffic enforcement.

For the reasons to be discussed, the Defendants' Motion for Summary Judgment is due to be **GRANTED**.


## II. Summary Judgment Standard

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. Facts

Based on submissions of the parties, the following is an account of relevant facts with all justifiable inferences drawn in favor of the Plaintiff:

Beginning in 2006, Plaintiff Hanners was employed for approximately six years as a patrolman for the Auburn Police Department. Defendant Thomas Dawson was the Chief of the Auburn Police Department until he retired in July of 2013. Defendant Charles Duggan is the Auburn City Manager. As the City Manager, Duggan "is the ultimate decision maker" for hiring and firing employees, and "he may choose to accept or decline personnel recommendations" for termination decisions. (Doc. # 27-1 at 3); *see also* Duggan Depo., (Doc. # 25-4 at 9:22–10:5).

Throughout his tenure with the Auburn Police Department, Hanners was employed as a patrolman. Hanners never requested a promotion, and he was never promoted. Hanners Depo., (Doc. # 25-1 at 19:3–9). During his time with the Department, Hanners' performance evaluations stated that Hanners was barely meeting expectations, meeting expectations, or exceeding expectations. Tr. of Due-Process Hearing, (Doc. # 25-8 at 52:9–53:6; *see also id.* at 56:13–59:4).

However, except for his first annual performance evaluation in 2007, Hanners was told in each of his performance evaluations that he needed to improve his efforts in traffic enforcement. *See, e.g.*, Duggan Aff. Attachments, (Doc. # 25-2 at 90 (stating that, from August 2007 to August 2008, Hanners met standards in "effectively patrol[ling his] assigned zone to detect and deter criminal activity and traffic violations," but that he "could score higher in this category by making more traffic stops during his next rating period"); *id.* at 94 (stating in Hanners' 2007–2008 evaluation that "Officer Hanners needs to be more active in traffic enforcement" and that he "should also improve on making more field interview contacts")). Further, Hanners was counseled about his performance prior to 2011. (*See id.* at 77–78 (stating that Hanners received performance counseling because, "[d]uring the month of November [2010] Officer Hanners issued seven citations, six warnings, and six field contacts," thus "averag[ing] to less than one contact in each category every two days")). Hanners was counseled on a number of occasions for what his supervisors perceived to be subpar traffic enforcement.[1]

---

[1] A summary of performance counseling and other "discussions/verbal warnings/documentation" associated with Hanners' traffic enforcement was provided with the written warning issued in August of 2012. Duggan Aff. Attachments, (Doc. # 25-2 at 71). On that form, Hanners was issued a written warning because, "[d]uring the month of July, 2012, Of[ficer] Hanners issued 11 traffic citations[,] . . . a decrease from the 12 citations he issued in June, 2012." (*Id.*). The warning then provides a summary of past discussions related to Hanners' traffic enforcement:

> On 07-25-2010, Of[ficer] Hanners was verbally counselled by S[ergeant] Hatchett about increasing his traffic enforcement. On 10-08-2010 and 10-14-2010, Of[ficer] Hanners was present in roll call when the need to increase traffic enforcement activities was discussed. On 12-09-2010, Of[ficer] Hanners received a performance counselling from S[ergeant] Hatchett with regard to his low level of traffic enforcement. On 12-16-2010, Of[ficer] Hanners was called to a corrective action meeting about his lack of traffic enforcement activities. On 01-03-2011, Of[ficer] Hanners was given verbal counselling about his lack of traffic enforcement activities by S[ergeant] Hatchett and S[ergeant] Ley. On 01-04-2011, Of[ficer] Hanners was given verbal counselling about his lack of traffic enfor[c]ement activities again. On 02-18-2011,

In late 2010, the Auburn Police Department instituted a "two-and-two policy" under which officers were required to have two contacts and two warnings, on average, per shift. *See* Tr. of Due-Process Hearing, (Doc. # 25-8 at 8:2–8). Hanners objected to the policy in January of 2011, contending that the policy presented officers with the moral dilemma of taking unnecessary enforcement actions and that the policy violated a City directive that forbids quotas. Hanners' supervisor responded by saying that, if Hanners and the other officers did not comply with the policy, they would "be written up, . . . wouldn't get promoted, [would] get bad evaluations, and . . . would ultimately be fired." Hanners Depo., (Doc. # 25-1 at 81:10–16); *see also* Tr. of Due-Process Hearing, (Doc. # 25-8 at 9:13–19).

After objecting to the two-and-two policy, Hanners was ordered to prepare a special report "detailing [his] moral objections to the . . . traffic enforcement policies." Duggan Aff. Attachments, (Doc. # 25-2 at 57). According to Hanners, "while [he understood] enforcement [was] part of [his] job, and ha[d] its purposes and merits, [he felt] a quota whether official, or unofficial, defined by a set number or deliberately vague [was] immoral and unethical." (*Id.*). In particular, "[w]hen officers are told to write more tickets or they will be written up and fired, it takes discretion away from the officer, can lead to bad or sloppy cases, lowers morale, and leads to a negative public image." (*Id.*). To Hanners, "[i]f officers [were] going to be written up for

> Of[ficer] Hanners received a 4 day suspension partly due to his lack of self-initiated activities. On 03-05-2012, Of[ficer] Hanners met with L[ieutenant] Coffey to discuss the performance expectation in the area of traffic enforcement. On 05-25-2012, L[ieutenant] Coffey again spoke with Of[ficer] Hanners about increasing his traffic enforcement activities. On 06-08-2012, S[ergeant] Neal addressed the performance expectations for the shift in the area of traffic enforcement. On 07-02-2012, Of[ficer] Hanners received a performance counselling from S[ergeant] Neal for Unsatisfactory Performance in regard to his enforcement activities.

(*Id.*).

failing to meet traffic standards then the 'standard' should [have] be[en] clear and defined in the directives." (*Id.*). Hanners insisted that he had "been counseled on [his] performance in this area" and that he had "since stepped up [his] enforcement and . . . had a monthly average of one citation and one warning a work day." (*Id.*).

At about the same time that Hanners prepared his special report, Dawson had been receiving complaints from Hanners' supervisors that "Hanners was simply not doing his job." Dawson Aff., (Doc. # 25-5 ¶ 13). "As a result, [Dawson and others] began to look into what it was [Hanners] was doing while at work." (*Id.*). Through this investigation, Dawson discovered that Hanners had been making obscene comments over the police chat system.[2] Dawson also discovered that "Hanners was spending time on Facebook and watching news shows." (*Id.*).

Dawson met with Hanners to discuss both Hanners' special report and the results of the investigation. Hanners Depo., (Doc. # 25-1 at 85:4–13). Hanners was not disciplined for his online activity, but he "had to forfeit annual leave[,] . . . was suspended for four days and had to get psychologically evaluated" because of his chat history. (*Id.* at 86:12–21; *see also id.* at 156:22–157:1).[3] The corrective action form that recommended disciplinary action also discusses Hanners' special report and states that it "generated some concern about [Hanners'] ideology as related to his ability to achieve his job expectations and comply with the goals and objectives of the Police Division and the City of Auburn." Duggan Aff. Attachments, (Doc. # 25-2 at 63). Hanners does not deny that his chat history was inappropriate; rather, he "absolutely"

---

[2] The content of the messages produced to the court need not be reproduced verbatim. Rather, it suffices to note that the messages contained violent and obscene content concerning Mexican immigrants and Bulgarian women. Hanners Depo., (Doc. # 25-1 at 141:21–142:4).

[3] The corrective action form also recommends that "Hanners receive additional training in Cultural Diversity, which may include Sensitivity and Ethics training." Duggan Aff. Attachments, (Doc. # 25-2 at 63). However, Hanners was never sent to training. Tr. of Due-Process Hearing, (Doc. # 25-8 at 16:12–14).

"recognize[s] that those remarks are inappropriate behavior." Hanners Depo., (Doc. # 25-1 at 142:15–19). Hanners did not appeal this discipline, and he did not initiate any kind of grievance. (*Id.* at 86:22–87:2). At some point after this discipline, but before June 2012, Hanners was placed on bike patrol.[4]

From February of 2011 until August of 2012, Hanners was not formally disciplined. In June of 2012, the Police Department adopted a new policy requiring each patrolman to make 100 contacts with the public per month.[5] *See* Tr. of Due-Process Hearing, (Doc. # 25-8 at 20:1–7). Under the policy, no more than 40 of the contacts could be warnings; the remainder of the contacts had to be some form of enforcement action, such as arrests or field interviews. (*Id.*). Hanners did not meet the 100-contacts requirement in June; rather, he "was given credit for 67 contacts, and [he] received a performance counseling." (*Id.* at 21:9–11). By contrast, Hanners had 111 contacts in July. (*Id.* at 21:12–14). Despite seemingly exceeding the numerical goal, Hanners was told that he "didn't have enough tickets in there." (*Id.* at 22:8). Specifically, although he had "double digit arrests, double digit tickets[.] . . . [and] close to 70 field interviews," his supervisors told him that he "was expected to be balanced" and "needed to have even across the board." (*Id.* at 22:6–14). As a result, Sergeant Neal counseled Hanners on his performance and issued Hanners a written warning. Specifically, because "Hanners issued 11 traffic citations[ in July,] . . . a decrease from the 12 citations he issued in June," Neal issued

---

[4] The court has not been presented with any evidence of an exact date on which Hanners was placed on bike patrol. The only indication the court has received of the timing is that it "was probably about a year[,] . . . maybe close[r] to a year and a half" before Hanners' due-process hearing before Judge McLaughlin, described below. Tr. of Due-Process Hearing, (Doc. # 25-8 at 18:2–6). The transfer appears to have occurred prior to the policy change in 2012. (*See id.* at 21:6–22:3 (discussing his failure to meet the Department's contacts requirement as a bike patrolman)).

[5] Officers worked twelve-hour shifts on a "four days on and four days off" basis. Hanners Depo., (Doc. # 25-1 at 137:14–16). Hanners stated that he was "working basically fourteen twelve[-hour] shifts a month, roughly, depending on how the days fall." (*Id.* at 138:3–5).

Hanners a written warning for failing to "obey any and all lawful orders from a superior officer," performing unsatisfactorily, and failing to write traffic citations as required by the officer's duties. Duggan Aff. Attachments, (Doc. # 25-2 at 71). Despite this warning, Hanners received his merit raise in August 2012. Hanners Depo., (Doc. # 25-1 at 234:5–235:10).

In August of 2012, Chief Dawson met with Hanners' shift. *See* Dawson Aff., (Doc. # 25-5 ¶ 3).[6] At that meeting, "it was brought to [Dawson's] attention . . . that some of the officers felt that their supervisors were providing numerical goals for their work which the officers were uncomfortable with." (*Id.*). Officer Reid Chambers was the first to voice his opposition to the numerical goals, and Hanners also spoke against them at the meeting. *See* Hanners Depo., (Doc. # 25-1 at 118:4–121:21).[7] Dawson viewed the officers' concerns as being misperceptions, and he "told the patrol captain and the assi[s]tant chief to correct the problem and make sure Sergeant Neal understood where he had gone wrong." Dawson Depo., (Doc. # 25-6 at 50:6–9). Specifically, Dawson believed the officers were misconstruing a numerical goal for contacts as a quota for citations, and Dawson did not want Neal "telling people they had to have specific numbers during that time." (*Id.* at 50:14–16; *see also id.* at 47:3–17). Sergeant Neal was disciplined for incorrectly conveying his message. Dawson Depo., (Doc. # 25-6 at 47:18–48:1).[8]

---

[6] According to Dawson, this meeting was an annual or semiannual event in which he would "meet with the patrol officers only—no supervisors [were] involved—to get their concerns and get their input on how [they could] better—have a better department, better services in Auburn and to get any [other] information." Dawson Depo., (Doc. # 25-6 at 43:5–10).

[7] Officer Klepper, an officer present at the meeting but who was on a different shift than Hanners, also voiced his opposition. Hanners Depo., (Doc. # 25-1 at 121:2–21).

[8] Officer Reid Chambers was ultimately promoted to corporal despite having been the first to voice his concerns over a numerical goal. Dawson Aff., (Doc. # 25-5 ¶ 16).

After the chief's meeting, Hanners was transferred from bike patrol to car patrol. *See* Dawson Aff., (Doc. # 25-5 ¶ 6).[9] As a result, "Hanners initiated a grievance about the [patrol] transfer claiming it was punishment for opposing what he perceived as a quota." Dawson Aff., (Doc. # 25-5 ¶ 6).[10] Hanners also submitted a complaint to the Alabama Ethics Commission about the alleged quota system and about rumors of corruption involving Dawson. (*See id.* ¶ 7); *see also* Hanners Depo., (Doc. # 25-1 at 95:2–96:10). "On October 17, 2012 [Lieutenant] Dorsey was asked to initiate an Internal Affairs (IA) investigation regarding the allegations of the grievance and the contents of an email alleging corruption that Hanners sent to the Alabama Ethics Commission." Dawson Aff., (Doc. # 25-5 ¶ 7). On November 13, 2012, Dawson informed Hanners that he was referring the matter to Bill James, the Public Safety Director, "[b]ecause [Hanners'] grievance . . . made allegations against [Dawson]." Dawson Aff. Attachments, (Doc. # 25-5 at 8); *see also* Dawson Aff., (Doc. # 25-5 ¶ 7).

The Ethics Commission ultimately informed Hanners that his concerns were "just not the type of complaints they address and deal with." Hanners Depo., (Doc. # 25-1 at 109:8–11). As a result, the Ethics Commission complaint did not result in any action against Dawson or any other member of the Police Department. Further, at the conclusion of Lieutenant Dorsey's investigation, "Director James provided no relief to Hanners as a result of the grievance finding no issue with reassignment in the patrol section and no fault in holding Hanners responsible for

---

[9] Hanners' partner also told Hanners that Sergeant Neal approached him after the Chief's meeting and warned him to distance himself from Hanners. Hanners Depo., (Doc. # 25-1 at 253:18–254:17). Specifically, Neal warned the partner that "the hammer was going to drop on" Hanners and that the partner would not want to be involved. (*Id.*).

[10] At some unspecified time "[d]uring the grievance process," Hanners sent letters to the Attorney General and the Equal Employment Opportunity Commission on the same subject matter. Hanners Depo., (Doc. # 25-1 at 110:8–13; *id.* at 113:5–9). Neither letter resulted in any action. (*See id.* at 112:7–15; *id.* at 113:19–22).

being productive on his shift." Dawson Aff., (Doc. # 25-5 ¶ 7); *see also* Dawson Aff. Attachments, (Doc. # 25-5 at 10–11).

Hanners appealed James's decision to Duggan, and Duggan appointed Judge Joe Bailey to conduct a hearing on Hanners' grievance. Duggan Aff., (Doc. # 25-2 ¶ 8). "Hanners was given a full hearing and the hearing officer issued a recommendation that the 'grievance issues as set forth by the Officer [were] without merit and that no action [was] necessary, appropriate or required on the part of the City.'" (*Id.* (quoting Duggan Aff. Attachments, (Doc. # 25-3 at 90))). In particular, Judge Bailey rejected Hanners' complaints concerning his reassignment, because "[i]t [was] clear from departmental procedures that supervisory personnel have the authority to freely transfer officers from one position to another when there is no reduction in rank or reduction of pay." Duggan Aff. Attachments, (Doc. # 25-3 at 87). Consequently, "[t]he rank and file simply does not have the right to choose or assign them to their preferred work assignment," but instead "are to accept such lateral transfers and do their very best to complete the tasks for the position into which they are transferred." (*Id.*). Hanners had "candidly admitted that . . . he suffered no reduction in rank and that there was no reduction in his wages" when he was transferred, (*id.* at 88), and there was "simply no valid claim prohibiting such transfers, period," (*id.* at 87). Duggan ultimately agreed with Judge Bailey "that the grievance [was] not sustained." (*Id.* at 83).

"[D]uring the grievance investigation, it was discovered that Hanners had been recording supervisors during roll calls, meetings and counseling sessions" in violation of the City's Personnel Policies. Dawson Aff., (Doc. # 25-5 ¶ 8). Moreover, the investigation revealed "that Hanners was approaching officers who had past disciplinary issues and encouraging them to revisit the facts/circumstances and challenge the discipline." (*Id.* ¶ 9). "It was also discovered

during the continued grievance process that Hanners violated a direct order from Lieutenant Dorsey to not discuss the [internal affairs] investigation," because "Hanners had obtained a statement from his old partner (Officer Murphy) that was taken during the [internal affairs] investigation." (*Id.* ¶ 10). Hanners admits to having recorded his supervisors without informing them, and he admits to having obtained Murphy's statement. *See* Hanners Depo., (Doc. # 25-1 at 249:21–250:2; 245:15–247:23). As to Murphy's statement, however, he insists that he did not breach direct orders because he had been informed that the internal affairs investigation had been concluded. Tr. of Due-Process Hearing, (Doc. # 25-8 at 46:13–48:16).[11] Hanners does not mention whether he approached officers and encouraged them to question past discipline. Because of Hanners' potential breach of Dorsey's order, "both Hanners and his ex-partner were placed on leave with pay so an investigation could be conducted." Dawson Aff., (Doc. # 25-5 ¶ 10).[12]

"Assistant Chief Paul Register conducted [the] investigation of Hanners[] [and Murphy's] alleged misconduct." (*Id.*). As a result of the investigation's findings, Hanners' termination was recommended to Dawson by Captain Cedric Anderson of the Patrol Section, Duggan Aff. Attachments, (Doc. # 25-2 at 23), Sergeant Jimmy V. Butler, Jr. of the Narcotics Division, (*id.* at 27), and Lieutenant Matthew Coffey of the Patrol Section, (*id.* at 30). On January 17, 2013, Dawson sent Hanners a letter stating that he had "received written recommendations regarding an internal investigation into [Hanners'] conduct" and that, "[u]pon review of the recommendations of [Hanners'] supervisor and related documents, [he] concur[red] with

---

[11] Hanners contacted Murphy for his statement soon after Bill James notified Hanners that the investigation into his grievance had been closed. Hanners Depo., (Doc. # 25-1 at 245:17–246:7).

[12] Ultimately, "Officer Murphy suffered a severe suspension for participation in discussing the [internal affairs] investigation and/or providing his [internal affairs] statement to Hanners." Dawson Aff., (Doc. # 25-5 ¶ 14).

[Hanners'] supervisors that" Hanners had violated a number of Police Directives and City Personnel Policies. Duggan Aff. Attachments, (Doc. # 25-2 at 20). Specifically, Dawson found that Hanners had violated "Directive A-503, Internal Affairs Investigation[;] Directive 432, Dissemination of Information[;] Directive 454, Lawful Orders[;] City Policy 5.04: Refusal to obey reasonable and/or necessary orders or job assignments[; and] City Policy 7.11: Recording Conversations." (*Id.*). As a result of these violations, Dawson "concur[red] with the recommendations of [Hanners'] supervisors that [Hanners'] employment with the City of Auburn be terminated." (*Id.* at 21).

Hanners appealed Dawson's decision. First, Public Safety Director James upheld the termination recommendation, (*id.* at 18), and then Hanners appealed the decision to Duggan. Duggan referred the termination decision to a hearing officer, Judge James McLaughlin, who determined that dismissal was appropriate based on Hanners' conduct. (*See id.* at 16). Thereafter:

> [w]hen [Duggan] received a recommendation for Hanners' termination, [he] reviewed all of the attached materials . . . in order to determine whether Hanners should be terminated. [He] accepted the recommendation for termination because Hanners violated direct orders regarding an Internal Affairs investigation and had repeatedly recorded supervisors in meetings and roll calls, without disclosing that he was making the recordings or without making those individuals aware of his recordings after it occurred in violation of the City's Personnel Policies. This decision was further effected by Hanners' past discipline issues and his work evaluations. Last, Hanners was given a full due process hearing before a hearing officer, Judge James McLaughlin, who found Hanners' recommended dismissal should be upheld. The hearing officer's finding also had an impact on [Duggan's] decision. [Duggan] issued a letter to Hanners on March 29, 2013 terminating his employment.

Duggan Aff., (Doc. # 25-2 ¶ 4). Thus, "Duggan made the final decision that Hanners [sh]ould be terminated." (Doc. # 27-1 at 4); *see also* Duggan Aff., (Doc. # 25-2 ¶ 4).

**IV. Discussion**

The Plaintiff brings a claim under § 1983 for retaliation in violation of his First Amendment rights and a claim for a violation of the State Employees Protection Act. For convenience, the court addresses the two claims in reverse order.

**A. Plaintiff's State-Law Claim**

The Defendants argue that Hanners' claim under the Alabama State Employees Protection Act, Ala. Code § 36-26A-1–7, necessarily fails because Hanners is not a state employee. Further, the Defendants assert that there is no causation evidence linking Hanners' purported "whistleblowing" activity and his termination; rather, Hanners was terminated for legitimate reasons. Finally, the Defendants argue that the city is entitled to immunity for any intentional actions that violate state law, and the individual defendants are entitled to state-agent immunity because there is no evidence that they acted maliciously or in bad faith. Hanners does not respond to these arguments.

As stated in Section 36-26A-3 of the Alabama Code:

> [a] supervisor shall not discharge, demote, transfer, or otherwise discriminate against *a state employee* regarding the state employee's compensation, terms, conditions, or privileges of employment if the state employee, reports, under oath or in the form of an affidavit, a violation of a law, a regulation, or a rule, promulgated pursuant to the laws of this state, or a political subdivision of this state, to a public body.

(emphasis added). A "state employee" is "[a] person defined as a classified employee under [Alabama Code] Section 36-26-2," *id.* § 36-26A-2(2), and thus includes "[a]ll offices or positions of trust or employment in *the state service* now or hereafter created except those placed in the unclassified service or exempt service," *id.* § 36-26-2(3) (emphasis added) (defining "classified service"). Importantly, "state service" only includes "[a]ll offices and positions of

13

trust or employment in the service of the Alabama state government, irrespective of whether the remuneration or compensation of such offices and positions of trust or employment is paid out of the State Treasury or not." *Id.* § 36-26-2(10). Explicitly excluded from the "state service" definition are "offices and positions of trust or employment of *the local governmental subdivisions*, county or city boards of education, teachers and employees thereof." *Id.* (emphasis added).

Hanners, as a city police officer, is an employee of a local governmental subdivision and thus is not a state employee under these definitions. *See id.* § 36-26A-3. Therefore, Hanners is not covered by the State Employees Protection Act, and summary judgment is due to be granted on this claim.

**B. Plaintiff's § 1983 Claim**

The Plaintiff alleges in his Complaint that, "[i]n making public complaints concerning the Police Department's quota system, [he] engaged in constitutionally protected speech regarding a matter of significant public concern." (Doc. # 1-1 ¶ 38). Further, the Plaintiff alleges that "Defendants engaged in [a] course of retaliatory conduct against Plaintiff designed to chill his public complaints regarding the quota policies" in violation of the First Amendment. (*Id.* ¶ 39). The Plaintiff claims that the "course of retaliatory conduct included adverse job performance reports, a concerted effort to tarnish Plaintiff's reputation on the force, demotion, and, ultimately, termination." (*Id.*).

The Defendant argues that summary judgment is due to be granted on Plaintiff's First Amendment claim for the following reasons: First, as to the City, the Plaintiff has presented no evidence, argument, or allegations of a custom or policy of retaliating against employees for

exercising their First Amendment rights. Second, the individual Defendants are entitled to qualified immunity because Hanners was terminated only after a full due-process hearing, thus breaking the causal chain to Duggan and Dawson. Further, both individual Defendants are entitled to qualified immunity because there is no evidence that either Dawson or Duggan had clear knowledge of a pattern of wrongful conduct, as is necessary for supervisory liability. Third, the bike patrol transfer, the warning, and the allegedly adverse job performance reports do not constitute adverse employment actions. Further, the Defendants argue that "[t]he transfer to patrol was to help increase [Hanners'] productivity." (Doc. # 27-1 at 33). Fourth, the Plaintiff has failed to show a constitutional violation, and so summary judgment is due to be granted for all of the Defendants. Specifically, Defendants argue, the Plaintiff's complaints about the alleged quota system did not constitute a matter of public concern; instead, Plaintiff was speaking as a disgruntled employee and not as a citizen. Moreover, the Police Department's interest in maintaining order outweighed Hanners' right to complain about the contacts requirement. Further, the Defendants have presented evidence that the Plaintiff's complaints did not impact their termination decision at all, and thus the Plaintiff's complaints were not a substantial motivating factor in that decision. Finally, the Defendants argue that, because of the Plaintiff's breach of direct orders and because of Plaintiff's violation of the Police Department's recording policy, the Defendants would have terminated the Plaintiff regardless of his quota complaints.

In response,[13] the Plaintiff focuses on the principle of single-act municipal liability under § 1983. Further, he argues that "the very nature of Plaintiff's complaints suggest[s] he spoke as a

---

[13] The court notes that much of the Plaintiff's argument centers on and cites to allegations in his Complaint. Indeed, the majority of his factual assertions either have no citation to evidence to support them or cite to the Complaint. Citations to a complaint do not constitute evidence sufficient to withstand a Defendant's properly supported motion for summary judgment. *See Celotex*, 477 U.S. at 324. Furthermore, the court has previously ordered that:

citizen rather than as an individual employee," and thus the Plaintiff's whistleblowing speech constituted a matter of public concern. Plaintiff's Brief, (Doc. # 32 at 11). Moreover, Hanners' "status as a 'rank and file' police officer favors First Amendment protection," because the city's interest in maintaining order is less pronounced with such non-supervisory employees. (*Id.* at 12–13). Finally, the Plaintiff argues that he has met his low burden of showing that his quota complaints were a substantial motivating factor in the termination decision, especially because he was not disciplined until after he began voicing his concerns, because he was terminated only after he continued exercising his rights, and because he was terminated in close temporal proximity to his complaints.[14]

Generally, "[t]o establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal

---

[i]f a document, including a deposition, is to be considered on the issue of summary judgment, a party shall specifically designate which parts of the document are deemed relevant. The designation of parts of depositions shall be by page and line numbers. No parts of documents not so specifically designated will be considered.

(Doc. # 28 at 1).

[14] The Plaintiff does not appear to allege that his retaliation claim succeeds based on the suspension he received for his chat history. (*See* Doc. # 1-1 ¶ 39). However, even if he had, any such claim would be time-barred, as the suspension occurred more than two years before the filing of the instant lawsuit. *See Lufkin v. McCallum*, 956 F.2d 1104, 1106 (11th Cir. 1992) (applying Alabama's two-year personal-injury statute of limitations to a § 1983 claim); *see also* Dawson Aff., (Doc. # 25-5 ¶ 13 (explaining that Hanners was suspended in February of 2011)). Further, the Plaintiff agrees that his chat history was inappropriate, Hanners Depo., (Doc. # 25-1 at 142:5–19), and he does not provide any evidence that Dawson's review of his chat history "was highly atypical[beyond merely stating that] management d[id] not regularly review police officer's chat histories," (Doc. # 32 at 3). Plaintiff only asserts that "[n]o chat histories for any other officers were reviewed" with the Plaintiff during his meeting with Dawson, but this proves nothing other than that Dawson did not speak with the Plaintiff about other officers' conduct during a meeting about the Plaintiff's conduct. (*Id.*). Apart from temporal proximity, the Plaintiff has presented no evidence to refute the legitimate reason for suspending the Plaintiff. As a result, even if the claim was not time-barred, it would fail because of the Plaintiff's failure to provide evidence of retaliation. *See Celotex*, 477 U.S. at 324.

relationship between the adverse conduct and the protected speech." *Castle v. Appalachian Technical Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). To show the requisite causal relationship, "the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Id.* "[O]nce the plaintiff shows that her protected conduct was a motivating factor, the burden shifts to the defendant to show that she would have taken the same action in the absence of the protected conduct, in which case the defendant cannot be held liable." *Id.*

Moreover, with public employees, the court follows a four-step analysis to determine whether the government employer undertook an adverse employment action against the plaintiff because of speech. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). First, the court determines "whether the employee's speech may be 'fairly characterized as constituting speech on a matter of public concern.'" *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987)). In particular, "[t]he court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern." *Id.* Second, if the speech may be characterized as constituting speech on a matter of public concern, the court "weigh[s] the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). "Again, the context and circumstances of the employee's speech must be considered" in balancing the parties' respective interests. *Id.* Third, "[i]f the public employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a 'substantial part' in the government's decision to demote or discharge the employee." *Id.* Finally, "if the employee prevails by showing that the speech was a substantial motivating factor in the state's employment decision, the state must

17

prove by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* at 1566 (alteration in original) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286 (1977)). Thus, for the final step, "the employer must show that 'its legitimate reason, standing alone, would have induced it to make the same decision.'" *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989)); *see also Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013).

The court will assume without deciding that the Plaintiff has met his burden on the first two prongs, namely that Hanners' complaints could be fairly characterized as constituting speech on a matter of public concern and that the employee's First Amendment interests outweigh the interests of the state in this case. However, the court finds that, even if these factors were proved, the Plaintiff's claims fail because the Defendants proffered legitimate reasons for their actions, the Plaintiff failed to show that some actions were sufficiently adverse, the Plaintiff failed to show a sufficient causal relationship, or a combination of these three. Thus, the court finds that summary judgment is due to be granted in favor of the Defendants on all of the Plaintiff's First Amendment retaliation claims.

*1. Adverse Job Performance Reports and Efforts to Harm the Plaintiff's Reputation*

The Plaintiff claims that he was retaliated against both by his supervisors' adverse job performance reports and by his supervisors' efforts to harm his reputation. For the reasons that follow, both claims fail.

First, the Plaintiff has failed to meet his burden as to the allegedly adverse job performance reports. "A public employee states a case for retaliation when the alleged employment action would likely chill the exercise of constitutionally protected speech." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005). "[A]ny . . . conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee' qualifies as an adverse employment action." *Id.* (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "[W]hen the injuries complained of are trivial or amount to no more than *de minimis* inconvenience in the exercise of First Amendment rights," the Plaintiff cannot claim that he suffered an adverse employment action. *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005).

Presumably, the Plaintiff is basing this claim on the performance evaluations, performance counseling sessions, and written warning he received for underperforming in traffic enforcement. However, the court has no evidence before it that the Plaintiff complained about the contacts requirement until January 2011; thus, any negative notations or counseling sessions he received prior to January of 2011 were necessarily not caused by his complaints. As a result, the court only analyzes those alleged adverse performance evaluations that post-date Hanners' objections and special report from January 2011.

The Plaintiff has not shown the performance evaluations, the counseling sessions, or the warning to be adverse employment actions. In particular, the Plaintiff has not shown any effect on his employment caused by any of the evaluations, the counseling sessions, or the warning that would deter a person of ordinary firmness from exercising his First Amendment rights. Rather,

despite the negative notes made on his performance evaluations, Hanners still received "barely meets standards" or "meets standards" ratings on his evaluations for effectively patrolling his zone and detecting and deterring criminal activity. Tr. of Due-Process Hearing, (Doc. # 25-8 at 56:21–57:16). As Hanners himself testified, "barely meets standards" is still "meeting standards," (*id.* at 57:16), and he received "exceeds standards" on other sections of his performance evaluations, (*id.* at 57:17–59:4). Further, at the culmination of all of the alleged retaliation in this case, Hanners received his merit raise in August of 2012. Hanners Depo., (Doc. # 25-1 at 234:5–235:10). "When a plaintiff's poor performance evaluation and compensation are 'inextricably intertwined,' a lower performance evaluation can constitute an adverse employment action," *Rainey v. Holder*, 412 F. App'x 235, 238 (11th Cir. 2011)[15] (citing *Crawford v. Carroll*, 529 F.3d 961, 971–72 (11th Cir. 2008)), but "when a lower performance evaluation does not result in a 'loss of pay or benefits or further discipline,' it does not constitute an adverse employment action," *id.* (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1240 (11th Cir. 2001)). *See also Clark v. Potter*, 232 F. App'x 895, 897 (11th Cir. 2007) (finding that a written "letter of warning for disrespecting a supervisor" was not an adverse employment action because the Plaintiff "admitted she did not lose pay[,] . . . suffer a loss of grade or employment benefits," or experience any other tangible job effect). As a result, the Plaintiff has not shown any alteration in his "compensation, terms, conditions, or privileges of employment, [any] depriv[ation] . . . of employment opportunities, or [any other] adverse[] [e]ffect[] [on] his or her status as an employee." *Gupta*, 212 F.3d at 587. Because the Plaintiff has failed to present any evidence showing the performance evaluations, performance counseling sessions, or the warning to be adverse employment actions, and especially because the Plaintiff received his merit raise in

---

[15] Although *Rainey* involved a Title VII claim, Title VII cases are used to inform the analysis of First Amendment retaliation cases. *Akins*, 420 F.3d at 1301 n.2.

August of 2012, his claim on his job performance reports fails. *Castle*, 631 F.3d at 1197 (placing the burden on the plaintiff to show that "she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech").

Further, the Plaintiff has failed to provide any evidence that his complaining about the contacts requirement was a substantial motivating factor for the allegedly adverse job performance reports, and the Defendants have shown that the Plaintiff would have received the counseling, evaluations, and warning regardless of his stance. Each allegedly negative evaluation and counseling pointed to Hanners' perceived underperformance in traffic enforcement. *See, e.g.*, Duggan Aff. Attachments, (Doc. # 25-2 at 90). Indeed, Hanners received several performance evaluations and counseling sessions prior to any discussion about the alleged quota system. (*See, e.g.*, *id.* (evaluating Hanners' performance from 2007 to 2008); *id.* at 71 (stating that Hanners was verbally counseled in July 2010)). Ultimately, based on a career-spanning issue with traffic enforcement, Hanners received a written warning for having a decreased number of citations in July over June. (*See id.* at 71). The Plaintiff has provided no evidence of any connection between these actions and his complaints about the alleged quota; rather, he received all of these "job performance reports" because of his underperformance in traffic enforcement. Indeed, any causal connection would be tenuous considering Plaintiff's excellent ratings in other categories. *See* Tr. of Due-Process Hearing, (Doc. # 25-8 at 57:17–59:4). Because the Plaintiff has not shown any evidence of a causal relationship, and because the Defendants have shown that Hanners would have received the particular counseling sessions, performance evaluations, and the written warning regardless of the Plaintiff's stance on the contacts requirement, Hanners' claim for retaliation based on "adverse job performance reports" fails. *See Bryson*, 888 F.2d at 1565 (placing the burden on the plaintiff to show that the protected speech "played a 'substantial part'

in the government's decision"); *id.* at 1566 (placing the burden on the state to prove "by a preponderance of the evidence that 'it would have reached the same decision . . . even in the absence of the protected conduct'" (quoting *Mt. Healthy*, 429 U.S. at 286)).

Second, the Plaintiff's claim that he was retaliated against because of his supervisors' efforts to tarnish his reputation also fails. The only mention of any such reputational attack is a passing reference that one of Hanners' supervisors called Hanners a racist. *See* Hanners Depo., (Doc. # 25-1 at 20:9–12). Specifically, a captain in the Police Department called Hanners a racist during a meeting in which the captain "promis[ed] [Hanners that] there would be consequences for filing [this] grievance." (*Id.* at 226:21–227:3). Hanners contested the captain's comment, including sending excerpts from a forum website in which Hanners "was trying to correct people that were making racist kind of derogatory remarks." (*Id.* at 139:23–140:7). However, it is undisputed that Hanners sent ethnically insensitive messages over the in-car chat system, and he "absolutely" "recognize[d] that those remarks [were] inappropriate behavior." (*Id.* at 141:21–142:19).

This passing comment by Hanners' captain is not an adverse employment action, but is instead at most a trivial injury or minor inconvenience. *See Bennett*, 423 F.3d at 1253. Further, the Plaintiff has not presented any evidence linking this comment by his supervisor with his stance on the alleged quotas. Beyond mere conjecture, the Plaintiff does not provide any basis for concluding that the supervisor's comment was motivated by the Plaintiff's complaints. Indeed, given the Plaintiff's ethnically charged messages over the in-car chat system, any such causal connection would be tenuous. *See* Hanners Depo., (Doc. # 25-1 at 141:21–142:4). Because the supervisor's passing comment was not an adverse employment action, and because the Plaintiff has not presented any evidence of any causal connection between the supervisor's

statement and the Plaintiff's speaking against the contacts requirement, the Plaintiff's claim that he was retaliated against by a "concerted effort to tarnish [his] reputation" fails. (Doc. # 1-1 ¶ 39); *see Castle*, 631 F.3d at 1197; *Bryson*, 888 F.2d at 1565.

### 2. Transfer from Bike Patrol to Car Patrol

The Plaintiff alleges that he was demoted in retaliation for his stance on the contacts requirement. (Doc. # 1-1 ¶ 39). The focus of this claim appears to be that the Plaintiff's transfer from his desired position on bike patrol to an undesired position on car patrol constituted retaliation.[16] For the reasons that follow, this claim fails.

First, the court agrees with the Defendants that the Plaintiff's transfer to car patrol did not constitute an adverse employment action. In this case, the Plaintiff admits that he did not lose any pay or benefits from his transfer to car patrol. Hanners Depo., (Doc. # 25-1 at 22:20–23:10). Moreover, the Plaintiff has not identified any other evidence or provided any other argument to show how a transfer to car patrol would "chill the exercise of constitutionally protected speech." *Akins*, 420 F.3d at 1301. Indeed, the Plaintiff has provided conflicting testimony as to whether bike patrol is less desirable than car patrol. *Compare* Tr. of Due-Process Hearing, (Doc. # 25-8 at 17:16–18:1 (describing being placed on bike patrol as having "been disciplined or suspended or

---

[16] There has been some confusion on the Plaintiff's part as to whether being transferred to bike patrol was undesirable. *Compare* Hanners Depo., (Doc. # 25-1 at 20:7–12 ("Q. Okay. And what retaliation do you claim you experienced? A. At first, suspension, and then I was threatened, called a racist, warned, taken off my duties as a bike patrol officer. And then I was ultimately terminated."); *id.* at 22:20–25:7 (stating that the Plaintiff wanted to be on bike patrol and considered patrol to be a "prestigious position")) *with* (Doc. # 1-1 ¶ (alleging that the Plaintiff was retaliated against because he was reassigned to the "less prestigious" bike patrol)); Tr. of Due-Process Hearing, (Doc. # 25-8 at 17:16–18:1 (describing being placed on bike patrol as having "been disciplined or suspended or investigated")). Because the Plaintiff initiated his grievance because of the transfer, however, the court believes the crux of his argument to be that he was transferred to car patrol in retaliation for his complaints. *See* Dawson Aff., (Doc. # 25-5 ¶ 6).

investigated")) *with* Hanners Depo., (Doc. # 25-1 at 20:7–12 (stating that the Plaintiff wanted to be on bike patrol and considered bike patrol to be a "prestigious position")). The Plaintiff's argument that he was removed from "a position that [he] trained for and desired and . . . put in for and was accepted for" is not enough. Hanners Depo., (Doc. # 25-1 at 23:4–7). At most, the transfer constituted a "trivial" injury or "*de minimis* inconvenience" to the Plaintiff, and thus the transfer to car patrol did not constitute an adverse employment action. *Bennett*, 423 F.3d at 1253.

Second, the court finds that no reasonable juror could find that the Defendants' "legitimate reason, standing alone, would [not] have induced it to make the same decision" to transfer Hanners in the absence of Hanners' complaints. *Hopkins*, 490 U.S. at 252. Although the transfer occurred very soon after the Chief's meeting with Hanners' shift, Hanners Depo., (Doc. # 25-1 at 31:5–20), the Plaintiff has provided no other evidence of any causal relationship.[17] Indeed, the Plaintiff has testified that he was told his transfer was a lateral, Tr. of Due-Process Hearing, (Doc. # 25-8 at 64:3–4), and his transfer was upheld as a staffing decision, *see* Dawson Aff., (Doc. # 25-5 at 10); Duggan Aff. Attachments, (Doc. # 25-3 at 87). As discussed, there is no doubt that the Plaintiff's supervisors had a long history of counseling the Plaintiff about his perceived underperformance in traffic enforcement, *see* Duggan Aff. Attachments, (Doc. # 25-2 at 71), and the Plaintiff admits that traffic enforcement was a "weak area" for him, Tr. of Due-Process Hearing, (Doc. # 25-8 at 56:16–17). Further, the transfer came immediately after the Plaintiff received a written warning over his continuing underperformance. *See* Duggan Aff. Attachments, (Doc. # 25-2 at 71). And, as argued by the Defendants, transfer to car patrol was

---

[17] Nor does Sergeant Neal's warning to Hanners' partner alter this determination. Hanners Depo., (Doc. # 25-1 at 253:18–254:17). Although also in close in temporal proximity to the Chief's meeting, Hanners has not provided any evidence that Neal's comments were related to Hanners' complaints rather than to some other issue, such as Hanners' perceived underperformance. Further, Hanners has not provided any evidence that Neal was involved with Hanners' transfer or that Dawson knew of or was involved with Neal's comments. Indeed, Hanners admitted that he had no evidence that Dawson "had anything to do with" Neal's comments. (*See id.* at 255:7–13).

designed to improve Hanners' traffic enforcement numbers. (Doc. # 27-1 at 33); *see also* Tr. of Due-Process Hearing, (Doc. # 25-8 at 35:20–36:8 (describing the difficulty of stopping a motor vehicle as a bike patrolman)).

Therefore, for these reasons, the Plaintiff's retaliation claim fails to the extent it claims that the Plaintiff was transferred to car patrol in retaliation for exercising his First Amendment rights.

*3. Termination*

Finally, the Plaintiff claims that he was terminated in retaliation for speaking in opposition to the alleged quota. Specifically, the Plaintiff claims that he was terminated "[f]or standing up about the ticket quotas, for not sitting down, and basically just keeping it going, keep complaining about it, and things like that." Hanners Depo., (Doc. # 25-1 at 252:7–10). For the reasons that follow, the Plaintiff's claim fails.

First, the Plaintiff has failed to provide any evidence that his speaking on the alleged quota was a substantial motivating factor in the termination decision. As has been discussed, the Plaintiff has the burden to show this factor. *See Bryson*, 888 F.2d at 1565.  The termination decision was not in close temporal proximity to his complaints; rather, the ultimate termination decision occurred in March of 2013, several months after his complaints at the Chief's meeting and the conclusion of his grievance. Duggan Aff., (Doc. # 25-2 ¶ 4). Further, the Plaintiff has presented no causal evidence linking his stance on the alleged quota to the ultimate decision by Duggan. Indeed, any such causal evidence would be attenuated by the fact that the Plaintiff went through several layers of review. Most important, the Plaintiff's termination was recommended by Judge McLaughlin in a due-process hearing, and there is no indication that Judge McLaughlin

was motivated by the Plaintiff's complaints about the alleged quota in making his termination recommendation. *See* Duggan Aff. Attachments, (Doc. # 25-2 at 14–16). Because the Plaintiff has failed to present any evidence of a causal connection between his termination and his complaints, the Plaintiff's claim fails.

Second, even had the Plaintiff shown that his complaints were a substantial motivating factor, the Defendants have met, by a preponderance of the evidence, their burden to show that the Plaintiff would have been terminated regardless of whether he had challenged the numerical goals. The Defendants have reiterated numerous times that the Plaintiff was terminated primarily because he recorded conversations without disclosing the recordings and because he violated a direct order by discussing an internal affairs investigation. *See, e.g.*, Duggan Aff., (Doc. # 25-2 ¶ 4); Dawson Aff., (Doc. # 25-5 ¶¶ 8–12). Further, the Defendants acknowledge that the Plaintiff's performance history factored into their decision; however, the Plaintiff's performance is separate from his complaints about the contacts requirement. (*See id.*). The Plaintiff fully admits that he violated the recording policy, and, despite his argument that he was confused by the full import of the direct order from Lieutenant Dorsey, it is undisputed that he discussed the investigation with Officer Murphy. *See* Hanners Depo., (Doc. # 25-1 at 249:21–250:2; *id.* at 245:15–248:8). Moreover, the Plaintiff admits that traffic enforcement is a "weak area" for him, and he does not contest the negative notations about his traffic enforcement. Tr. of Due-Process Hearing, (Doc. # 25-8 at 56:16–57:16). For these reasons, the Defendants have met their burden of showing by a preponderance of the evidence that the Plaintiff would have been terminated regardless of his complaints, and the Plaintiff admits the Defendants' bases for the termination. Thus, the Plaintiff's claim for retaliatory termination fails.

## **V. Conclusion**

Plaintiff Hanners was a municipal, not a state, employee and, therefore, is not covered by the State Employees Protection Act (Count One). As to his Section 1983 claim (Count Two) alleging a violation of his constitutional right to freedom of speech, he has failed to present to the court sufficient evidence of a genuine issue of material fact, from which any reasonable juror could find that his speaking out in opposition to what he perceived to be a quota system requirement in traffic enforcement was a substantial motivating factor in any adverse employment action taken against him. Thus, summary judgment is due to be granted in favor of all of the Defendants and against Plaintiff Hanners on both claims. Accordingly, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment (Doc. # 25) is **GRANTED**.


DONE this 18th day of August, 2014.


 /s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE